**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

| | |
|---|---|
| **KEVIN DWAYNE BARRETT,** | |
| Plaintiff**,** | |
| **v.** | **CIVIL ACTION NO.: 1:17-CV-30** |
| | **(JUDGE KEELEY)** |
| **NANCY A. BERRYHILL,** | |
| **Acting Commissioner of Social Security,** | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

**I.   INTRODUCTION**

On February 27, 2017, Plaintiff Kevin Dwayne Barrett ("Plaintiff"), by counsel Brian

Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g). (Compl., ECF No. 1).  On May 8, 2017, the Commissioner, by counsel Helen Campbell

Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the

proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On June 2, 2017, and June 28, 2017,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s

Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No.

11).   Following  review  of  the  motions  by  the  parties  and  the  administrative  record,  the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

On August 13, 2013, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on January 9, 2013. (R. 207).  Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2016; therefore, Plaintiff must establish disability on or before this date. (R. 226).  This claim was initially denied on September 24, 2013 (R. 100, 74) and denied again upon reconsideration on November 19, 2013 (R. 130, 102).   On December 2, 2013, Plaintiff filed a written request for a hearing (R. 158), which was held before United States Administrative Law Judge ("ALJ") Regina Carpenter on May 19, 2015 in Morgantown, West Virginia. (R. 38).  Plaintiff, represented by counsel Brian Bailey, Esq., appeared and testified, as did Larry Bell, an impartial vocational expert. (<u>Id</u>.). On July 27, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 18-35). On February 7, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.   <u>BACKGROUND</u>

### A.   **Personal History**

Plaintiff was born on October 28, 1974. (R. 44). Although the hearing transcript lists Plaintiff as stating he was forty-nine (49) years old at the time of the hearing, (R. 44), his date of birth indicates he was thirty-nine (39) years old at the time, and thirty-eight (38) when he filed his first SSI claim. (R. 207). He completed seventh grade (R. 46). Plaintiff's prior work experience included painter for a pipeline company, delivery truck driver/retail sales, rig hand,

lottery machine service technician/installer, golf course maintenance worker. (R. 42-58). He was single at the time he filed his initial claim (R. 207) and was single at the time of the administrative hearing. (R. 45). He has no dependent children. (R. 45). Plaintiff alleged disability based on inability to strain due to his feeding tube, "must clean tubes out because of no nose, trouble speaking, dizzy spells, reconstructive surgeries are needed." (R. 102). His impairments were considered at the initial level and determined to be amputation of the nose, depression, and anxiety (severe), as well as obesity and alcohol addiction disorder (non-severe). (R. 106).

**B.    Relevant Medical History**

On January 9, 2013, Plaintiff was "watching TV with [his] family, when [he] promptly stood and walked out." (R. 379). Approximately thirty (30) minutes later, police contacted the family to advise that Plaintiff had shot himself. Id. Plaintiff was taken to Stonewall Jackson Hospital Emergency Department with multiple self-inflicted gunshot wounds to the face. (R. 331-355). Dr. Snuffer noted that the injury was from a .243 caliber rifle, and that Plaintiff's "nose [and] whole lower face [we]re absent." (R. 331). Plaintiff was transferred to WVU (Ruby Memorial) Hospital, where he was admitted to the Intensive Care Unit. (R. 366). Alison Wilson, M.D. related that the report stated Plaintiff "shot himself in the face twice, shot up from his chin," which resulted in extensive injury to his lower and mid-face. (R. 365).

Plaintiff underwent surgeries to repair extensive mid-face lacerations and a feeding tube was placed for nutrition and medication. (R. 362). Operation revealed complete traumatic amputation of the nose (R. 361) and complete loss of half of the upper lip; complex facial lacerations to the soft palate and labial mucosa, extending into the upper cheeks bilaterally. (R. 370). There were also "extensive comminuted fractures [] involving the nasal bones, hard palate, bilateral maxilla and ethmoid bones," anterior subluxation of the right temporomandibular joint.

(R. 361). Fragments of metal and tooth/bone were scattered throughout. Id. Plaintiff was directed to follow up with Opthamology, ENT and Trauma following his discharge on January 21, 2013 and to continue psychological therapy as an outpatient. (R. 504).

Plaintiff followed up with WVU Opthamology on January 28, 2013, noting excessive tearing from his eyes daily and numbness in his cheeks. (R. 596-97). At that time it was noted that after ENT consult Plaintiff's doctors "d[id] not feel that there are options for repair of the bony structure of the face at this time [because] there is no significant bone of the mid-face which could be used to anchor an orbital fracture repair." (R. 599). Progress notes noted no significant visual deficits and no significant pain. (R. 602). Plaintiff reported "drainage from his nose [] nearly continuously since the [injury which has] caus[ed] a significant amount of crusting;" also, that occasionally, food regurgitates from his mouth into his nose. Id. Overall, Plaintiff was doing well. Id. He was directed to follow up with Dr. Armeni in four weeks, and advised that a nose prosthesis was a more viable option for him than nasal reconstruction surgery, given the extensive nature of his wounds. Id.

At follow-up with Trauma on February 5, 2013, Plaintiff reported no problems at that time and declined a referral to psychiatry. (R. 604). At a follow-up with ENT on February 13, 2013, Plaintiff reported worsening nasal obstruction on both sides, but much worse on the right. (R. 607). Dr. Armeni dilated the left nasal passage due to partial obstruction and trouble breathing. (R. 608). He thought Plaintiff would likely need to have his right nose reopened if possible, and a stent placed in it. Id. Although Plaintiff was initially breathing well following the procedure, he reported back to the Emergency Room later that day because he felt his nasal passage was closing. Id. Plaintiff was discharged to home with directions to be seen at the ENT clinic. (R. 610). On February 19, 2013, Dr. Armeni placed a nasal trumpet into Plaintiff's left

nasal cavity to prevent any further stenosis (narrowing) and discussed having surgery to create a new nasal opening. (R. 616). Plaintiff decided to hold off on surgery for the time being. Id.

At follow-up on March 15, 2013, Dr. Armeni noted that Plaintiff's "right nasal cavity is completely scarred and occluded anteriorly." (R. 617). He removed and cleaned the nasal trumpet, then sutured it back in place. Id. At follow-up with Otolaryngology on March 29, 2013, significant swelling over his piriform aperture, complete closure of the right-sided nasal passage, and the development of granulation tissue around his left nasal trumpet were observed. (R. 618). On May 2, 2013, Plaintiff underwent surgery for recavitation of the right nasal cavity. (R. 623). At follow-up with otolaryngology on June 24, 2013, Dr. Armeni instructed Plaintiff he could start leaving the splints out of his nose more frequently, for about half an hour daily, and reinsert the nasal trumpets if he notices any narrowing of the passage. (R. 641). Plaintiff was scheduled for follow-up in two months, at which point Dr. Armeni noted it would be appropriate to start discussing prosthetics. Id.

Robert Snuffer, D.O., treated Plaintiff as his primary care physician and saw him at regular intervals. Progress notes from October 16, 2013, note Plaintiff was "about the same." (R. 710). Plaintiff "still ha[d] a lot of problems going out in public;" Dr. Snuffer hoped this would improve once Plaintiff obtained a nose prosthesis. (R. 710-11). He was breathing better after having surgery to remove most of the septum the previous month. Id. On November 12, 2013, Plaintiff's family called Dr. Snuffer's office for a referral "ASAP" because Plaintiff was threatening to harm himself again and they were concerned. (R. 709). They were instructed that Plaintiff should go to United Summit Center ("USC") as a "walk-in for crisis." Id.

On November 14, 2013, Plaintiff reported to USC seeking treatment for depression, anxiety, and panic attacks. (R. 763). He presented as withdrawn, with a depressed mood and

blunted affect. Id. He reported "feeling very depressed and experiencing mood swings . . . [and] crying episodes that seem to happen for no reason." Id. He also reported feeling very anxious in public places and having panic attacks "nearly every time he leaves his home;" as a result, he only leaves his house to attend doctor's appointments. Id. Plaintiff reported getting only a few hours of sleep each night, but has gone up to a couple of days without any sleep. Id.  Plaintiff stated that symptoms began in January 2013 after he went to his girlfriend's house to "gather some of his things because they had gotten into a fight and were breaking up." Id. He stated that his girlfriend told police that he had shot himself and the incident reported as an attempted suicide, but he "does not believe that he actually shot himself"  because he remembers boot marks on his face from being kicked, and money being stolen from his wallet and truck. Id. He reported continuing paranoia about seeing "the people who attacked him." Id. Plaintiff's symptoms included "excessive anxiety that is difficult to control," fatigue, difficulty concentrating, and trouble sleeping. (R. 764). He was diagnosed with Major Depressive Disorder (single episode, moderate) and Generalized Anxiety Disorder. Id. Plaintiff exhibited mild dysfunction in self care (Domain I) and activities of community life (Domain II), and moderate dysfunction in social, interpersonal and family relationships (Domain III) and concentration and task performance (Domain IV). Id.

On December 4, 2013, Plaintiff returned to USC presenting with a depressed mood and congruent affect, and fair hygiene and grooming; he was alert and oriented. (R. 768). Plaintiff reported that his depression and anxiety had been "much worse the last five months." Id. His anxiety, panic attacks, and insomnia had not improved. Id. He was to discontinue Prozac, Amitriptyline and Buspar, and start taking Zoloft and Vistaril instead. (R. 769).

6

Dr. Snuffer noted at follow-up on December 19, 2013 that Plaintiff had "a lot of drainage from posterior nasal passages," was still anxious, and was not going out much. (R. 708).

On March 10, 2014, Plaintiff reported to USC for follow-up. He reported that therapy had been helpful for him and his depression had improved with medication, but he still occasionally felt hopeless and helpless, occasionally had suicidal thoughts, and was still experiencing a lot of anxiety. (R. 765). He was still getting only two to three hours of sleep per night. Id. His symptoms included depressed mood, loss of interest, insomnia, fatigue, guilt, excessive anxiety, and difficulty concentrating. (R. 766). His symptoms continued to "cause significant distress in social functioning." Id.

On April 15, 2014, Plaintiff reported to Dr. Snuffer that he was "less anxious [and] getting out a little better by himself." (R. 705). Dr. Snuffer noted that Plaintiff "took a trip to Mississippi to see a girl and did well." (R. 704).

At follow-up with USC on June 16, 2014, Plaintiff appeared more talkative than before. (R. 761). He reported that his depression had been improving; he was sleeping more (about six hours per night) and his energy had "somewhat improved." Id.  Anxiety was still a problem, however, especially around people; he had had one panic attack recently. Id. He reported that he had been getting out more, had gone to Mississippi to visit a friend, and was working at a friend's car detailing shop. Id. Therapist notes from that session indicate his GAF score was still at 50, and he was still exhibiting depressed mood and excessive anxiety with associated symptoms and distress in social functioning. Id.

On August 14, 2014, Dr. Snuffer noted that Plaintiff was "still having occasional drying and closure of nasal septum," but was otherwise doing okay with his facial wounds. (R. 702). As to anxiety, Plaintiff was "still anxious about going [out] in public." Id.

At follow-up at USC on July 27, 2015, however, Plaintiff reported increased depression and withdrawal, suicidal thoughts, and "some fleeting homicidal thoughts." (R. 783). He stated that he had gotten a prosthetic nose, but that "the glue will not hold it on appropriately." (R. 783). He reported he was no longer "working at his friend's detailing shop due to the amount of people that come and go and the level of his anxiety." Id. "He still experiences some anxiety, especially around people . . . he has not left the house very often . . . his energy 'comes and goes.'" Id. By October 25, 2015, Plaintiff presented with "mild symptoms of panic, agitation, oppositional behavior, moderate symptoms of depression, anxiety, hopelessness, helplessness, apathy, change in energy, distractibility, loss of interest, sleep disturbance, motivation, engagement, poor concentration, suspiciousness, obsessive/intrusive thoughts, and severe withdrawal." (R. 785). He reported a slow decrease in depression and anxiety, and less frequent suicidal and homicidal thoughts – most recently, a "couple weeks ago." Id. He reported that he tries to avoid leaving the house if at all possible. Id.

1. **Medical Reports/Opinions**

    a. **Consultative Psychological Examination**

On August 20, 2013, Morgan D. Morgan, M.A. completed a consultative psychological examination of Plaintiff consisting of a mental status examination and a clinical interview. (R. 642-648). Plaintiff was cooperative, but presented as "rather tentative and self-conscious, especially frustrated." (R. 646). Morgan noted having reviewed "eight pages of medical documents from WVU Healthcare System [relating] to [Plaintiff's] facial injuries from shooting and treatment of [same]." (R. 643). Morgan also noted that he was "unclear as to whether [Plaintiff] just could not remember shooting himself, or was in denial, or actually did not shoot himself in the face." (R. 646).

Morgan found Plaintiff's immediate and recent memory to be within normal limits; his remote memory was mildly deficient. (R. 647). Plaintiff's insight was mildly deficient, and his judgment poor. (R. 644). His mood was dysphoric and anxious; his affect restricted. Id. Morgan found Plaintiff's social functioning and persistence to be moderately deficient; his concentration within normal limits; and his pace mildly deficient. (R. 647). Morgan diagnosed Major Depressive Disorder (single episode, severe, without psychotic features, with anxiety features), and Alcohol Use Disorder (mild, in remission). (R. 646). Morgan opined that Plaintiff's prognosis was "poor." Id.

### b. *Disability Determination at the Initial Level*

On July 16, 2013, agency reviewer Caroline Williams, M.D. reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 80). Williiams found the following exertional limitations: Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand, walk, and/or sit for about six (6) hours in an eight (8) hour workday; and unlimited pushing and/or pulling. (R. 81). As to postural limitations, Williams found Plaintiff could frequently climb ramps, stairs, ladders, ropes, and scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. (R. 81). No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff could have unlimited exposure to wetness, humidity, noise, vibration, and extreme heat; but should avoid concentrated exposure to hazards and extreme cold, and avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilations. (R. 82). The narrative explanation accompanying these limitations noted, in relevant part, that otolaryngist records indicated normal examination results and "excellent" breathing with nasal trumpets, and that Plaintiff "appears to be recovering without complications since most recent surgery on [May 2, 2013] . . . Should

9

[claimant] cont[inue] to recover [without] complications, it is expected that he should be able to, at least, perform activities as described in this RFC." Id.

On September 23, 2013, agency reviewer Paula Bickham, Ph.D. reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") and Mental Residual Functional Capacity ("MFRC") assessment. (R. 79, 83). Bickham found Plaintiff had mild limitations in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 80). As to concentration and persistence limitations, Plaintiff was moderately limited in his ability to work in coordination with or in proximity to others without being distracted, and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 83). As to social functioning limitations, Plaintiff was markedly limited in his ability to interact appropriately with the general public and moderately limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 84). As to adaptation limitations, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting. Id. The following narrative explanation accompanied these limitations:

> The claimant is being evaluated under 12.04, 12.06 and 12.09.
> He appears mostly credible. The recent CE observed moderate limits [with social functioning] and persistence. IQ and Cognistat did not reflect memory or concentration deficits. Recent [office visit] with his new [primary care provider] indicated increased anxiety in public and isolation at home. The claimant did not allege limits based on cognitive or [social functioning] on the [Adult Function Report]. He completed the form independently.
> Please see the PRTF for the initial case discussion.
> The claimant retains the ability to learn and perform work-like activity with no contact [with] the general public.

(R. 84).

### c.  *Disability Determination at the Reconsideration Level*

On November 15, 2013, agency reviewer Narendra Pankshak, M.D. reviewed the prior RFC assessment and affirmed it as written. (R. 111). Pankshak noted in the narrative explanation, in part, that there was "no new [medical evidence of record] to suggest increased functional limitations, [and that claimant's] gunshot injury [] seems to be healing and he is awaiting prosthesis." (R. 110). On November 12, 2013, agency reviewer Philip Comer, Ph.D. reviewed the prior PRT and MFRC assessments and affirmed them as written. (R. 112). Comer noted in the narrative explanation, in part, that he had "reviewed evidence in [the] file, [and that] new [medical evidence of record] does not indicate additional significant mental/emotional limitations." (R. 113).

### d.  **Psychological Evaluation**

On April 24, 2015 Tony Goudy, Ph.D. conducted a psychological evaluation of Plaintiff, including a Clinical Interview, Mental Status Examination, and psychological testing. (R. 770-776). Dr. Goudy reviewed Plaintiff's medical records from United Summit Center, Morgan's consultative examination report, and progress notes from Dr. Snuffer. (R. 772).

Dr. Goudy observed that Plaintiff's appearance was striking pursuant to his missing nose, long beard, and mustache. (R. 773). Hygiene and personal care appeared "fair." Id. Plaintiff was cooperative, but "somewhat reserved." Id. His speech was relevant and coherent, but he did not generate any spontaneous conversation during the interview. Id.  Plaintiff was generally oriented to time, place, person, and circumstance. (R. 774).

Dr. Goudy observed that Plaintiff's affect was blunted, and he described his mood as "nervous." (R. 773). Dr. Goudy noted a history of suicidal ideation, in addition to Plaintiff's gunshot wound being self-inflicted according to witnesses and the police report, though Plaintiff

does not remember it. (R. 774). As to perception, Plaintiff denied hallucinations but admitted a history of paranoid ideation especially in public. Id. Immediate memory was intact; recent memory was moderately to markedly impaired, and recent memory was not significantly impaired. Id.  Concentration was markedly impaired, based on serial sevens and other task performance. Id.  Intellectual functioning was in the low average range, based on the interview, academic history, and prior test results. Id.  Judgment was significantly impaired, based on hypothetical assessment and further supported by a history of same, including "the incident where he shot his nose off." Id.

Dr. Goudy administered the Beck Depression Inventory-II (BDI-II), on which Plaintiff's score of 52 indicated severe levels of depression. (R. 774). Plaintiff highest-rated symptoms included sadness, pessimism, feeling like a failure, guilt, feeling as though he is being punished, self-criticalness, difficulty making decisions, feelings of worthlessness, irritability, and fatigue. Id.  On the Beck Anxiety Inventory (BAI), Plaintiff's score of 44 indicated severe levels of anxiety. Id.  Plaintiff's highest-rated symptoms included inability to relax, fear of the worst happening, heart racing, feeling terrified, nervousness, feelings of choking, shakiness, fear of losing control, and fear of dying. (R. 774-75).

Dr. Goudy diagnosed Major Depressive Disorder, Recurrent, Severe; Generalized Anxiety Disorder, and Panic Disorder without Agoraphobia. (R. 775). He considered Plaintiff's treatment records which showed a "steadily declin[ing]" emotional state since January 2013, a continued inability to maintain emotional control despite ongoing psychological treatment and medication, continuing severe psychiatric impairment reflected in low GAF scores, continued severe depression and anxiety, moderate to marked impairment in recent memory and marked impairment in concentration. Id. Dr. Goudy opined that Plaintiff had mild impairment in

12

activities of daily living, marked impairment in social functioning due to panic attacks and paranoia, marked impairment in concentration, persistence, and pace (particularly around groups of people), and one episode of decompensation (attempted suicide by gunshot in January 2013). (R. 776). Dr. Goudy opined that in considering 12.04 A.1.A, 12.06 A.1, and 12.06 A.3, "Mr. Barrett meets a listing based on a combination of psychological factors." (R. 775). Goudy also provided an explanation for differences in his findings compared to the prior consultative examination:

> It is important to note here that although the Morgan evaluation did not find marked impairment in concentration, Mr. Barrett's severe anxiety and paranoia around others would likely render his ability to concentrate as markedly impaired in the workplace. Moreover, as he feels intense paranoia in public and has increasingly isolated himself because of it, his social functioning would also be markedly impaired. Mr. Barrett's inability to maintain emotional stability has been consistently and longitudinally documented in the records from United Summit Center. Consequently, he would be expected to miss multiple workdays per week due to that instability.

(R. 775).

### e.  Statement from Treating Physician Dr. Snuffer

On June 4, 2015, Dr. Snuffer wrote a letter to Plaintiff's counsel responsive to the issues of "any information or opinion [he] may have regarding [Plaintiff's] ability to make visits or trips out of the State of West Virginia and as to his capacity for employment." (R. 777). Dr. Snuffer opined that Plaintiff's facial injury has "certainly created or perhaps aggravated a pre-existing extremely severe anxiety disorder[, and that Plaintiff] continues to have extreme difficulty adjusting to his post injury features." Id.  Dr. Snuffer noted that Plaintiff appears to be in some denial about the self-inflicted nature of his injury, as he continues to maintain that he is not sure what happened. Id.  Dr. Snuffer advised that he has no personal knowledge of Plaintiff taking any trips; only that Plaintiff had said that he made a trip to Mississippi to see a girl. Id. However, Dr. Snuffer added he now doubts that Plaintiff ever made such a trip because he has

observed in subsequent visits that Plaintiff claims to participate in activities or events that the people who accompany him indicate are not in fact occurring. Id.  Dr. Snuffer believed Plaintiff may be attempting to appear to be more "normal." Id.

Dr. Snuffer noted that Plaintiff's attempts to repair his teeth and obtain a prosthetic nose had been unsuccessful. (R. 778). As a result, Plaintiff's appearance gives him "extreme anxiety," to the point of "moderate to severe agoraphobia, and usually not going out in public" alone. Id. Dr. Snuffer further noted that a "near 40 pound weight gain from September 2013 to the end of 2014" led him to suspect Plaintiff is "quite depressed and inactive." Id. Dr. Snuffer concluded:

> Overall, in spite of his assertions to me of engaging in activities, I find Kevin to be extremely impaired and limited from a psychological standpoint. His facial features and difficulty with swallowing and breathing only add to his misery. I do not believe he can sustain any type of employment at this time.

Id.

### f.  Psychiatric Review Technique

On April 4, 2016, Dr. Jourdan Aromin, a treating psychiatrist, completed a Psychiatric Review Technique form with accompanying narrative explanation. (R. 791). His opinion was based on his own longitudinal psychological treatment of Plaintiff, which he began in October 2015 at Dr. Snuffer's request, as well as his review of Plaintiff's medical records. (R. 803). Aromin observed that Plaintiff "has presented with significant levels of anxiety and depression at all sessions." Id. Moreover, he "continues to be in denial" about the fact that his gunshot wound was self-inflicted, maintaining that he was shot by some other unknown person. Id.  Aromin opined that Plaintiff was "faced with an extremely unfortunate incident and residual emotional condition for which he ha[s] only a minimal, immature coping capacity." Id.  Aromin pointed to Plaintiff's tendency to "deal[] with stress by creating and voicing fantasy activities" such as visiting friends in other states, or participating in hunting or traveling activities – none of which

he has actually done. Id.   Rather, "these proved to be activities he had only observed on television and [] fantasized himself into." Id.  Aromin explained that "[b]y using this primitive coping defense, Kevin is able to push away or obtain some escape from his traumatic and intrusive thoughts surrounding the gunshot wound to his face." Id.

Dr. Aromin opined that Plaintiff met listings 12.04 and 12.06. (R. 791). As to listing 12.04, Affective Disorders, Dr. Aromin noted mood disturbance accompanied by anhedonia, appetite disturbance with change in weight, sleep disturbance, difficulty concentrating or thinking, thoughts of suicide, and delusions or paranoid thinking. (R. 794). As to listing 12.06, Anxiety-Related Disorders, Dr. Aromin noted generalized persistent anxiety accompanied by motor tension, autonomic hyperactivitiy, apprehensive expectation, vigilance and scanning; a persistent irrational fear of a specific activity or situation resulting in a compelling desire to avoid it; recurrent obsessions or compulsions that are a source of marked distress; and recurrent and intrusive recollections of a traumatic experience that are a source of marked distress. (R. 796). Dr. Aromin opined that Plaintiff had moderate to marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in concentration (and particularly) persistence and pace; and one or two episodes of decompensation, each of extended duration. (R. 801). Dr. Aromin further opined that Plaintiff's chronic mental conditions had lasted at least two years, caused more than a minimal limitation of ability to do any basic work activity (with symptoms or signs currently attenuated by medication or psychosocial support), and were accompanied by such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. (R. 802). Dr. Aromin's narrative explained that:

> Kevin continues to have marked difficulties in maintaining his social functioning. He
> prefers to isolate himself and avoids contact with others as much as possible. Continues

social contact and interaction aggravates his anxiety and depression. Kevin is additionally somewhat limited in his activities of daily living, even within his home. He often demonstrates poor hygiene and comes to his sessions in soiled clothes. His limitation in activities can approach marked limitation if those activities require him to be outside the sphere of his home. His discomfort around other[s], due to the physical deformity of his face, makes activities such as shopping, banking, or other types of even minimal public interaction quite difficult for him. In areas of useful concentration, persistence and pace, I would note that in session with Kevin he has demonstrated adequate concentration, but from his descriptions of his activities, he has markedly limited persistence and page. I would predict that, given his difficulty in other areas, with even minimal additional pressure, his concentration would be expected to deteriorate into markedly limited.

(R. 803). Dr. Aromin also agreed with and endorsed Dr. Goudy's opinion, including his findings of severe emotional disturbance in anxiety and depression, that the severity of Plaintiff's conditions met listings 12.04 and 12.06. (R. 804). Dr. Aromin additionally felt Plaintiff's situation was "quite fragile" and demonstrated that "even minimal increase in mental demands or other changes would likely cause him to further withdraw and compensate." Id. While Dr. Aromin has continued to encourage Plaintiff to try return to work, there has been "some slow progress" to date. Id. Ultimately, Dr. Aromin opined that Plaintiff has not been able to work since his injury in 2013, and is not yet prepared to return to a work environment at this time. Id.

**C.    Testimonial Evidence**

At the ALJ hearing held on May 19, 2015, Plaintiff testified that he was single and had no children. (R. 45). He lives with his parents. Id. He has a driver's license and has no difficulty driving. (R. 45-46). He completed seventh grade in high school and does not have a GED or any other type of schooling or training. (R. 46). He has no income at this time, but receives food stamps and a medical card. Id.

Plaintiff testified that he has not worked since January 2013. (R. 47). The ALJ questioned Plaintiff about information in the file that indicated that he had "been working for a detail shop owned by a friend." Id. Plaintiff testified that he had not worked there, but had "[gone] over there

a couple of times," as his friend was trying to help Plaintiff with social issues. Id. Plaintiff testified that he "went over there about three or four times and hung out with him [but] that was it." Id. Plaintiff testified that he did not earn any money for being at his friend's shop, and he does not know why his doctor's notes stated that he was "working when he is needed at his friend's car detailing shop in Clarksburg." (R. 48).

As to his work history, Plaintiff testified that he last worked in 2012 at Pro-Guard Eastern Division, a pipeline company, at which he painted above-ground pipeline pad assemblies. (R. 48-49). Prior to that he was employed from 2009 to 2011 at Home Warehouse of Clarksburg, where he drove a delivery truck and did in-store retail sales. (R. 49). In this job, Plaintiff operated a forklift and lifted siding and windows between one hundred to one hundred and fifty (100 – 150) pounds. (R. 54). Prior to that, he worked for Maximum Well Service as a rig-hand on a service rig. (R. 50). In 2006 Plaintiff was employed through Winan's, a temp agency through which he worked at Home Warehouse. (R. 50-51). In 2003, Plaintiff worked for Woodward Video as a service technician and installer of the West Virginia Lottery machines and video poker machines. (R. 51). In this job, Plaintiff lifted a hundred pounds, and it required 40 hours of training to get the necessary technician certificate. (R. 53). In 2001 and 2002, Plaintiff worked for Morgan Development Corporation doing golf course maintenance. (R. 52).

In response to questions from his attorney, Plaintiff testified that his psychological diagnoses included depression and anxiety. (R. 55). He testified that these conditions affect him in that he "pretty much ha[s] no social activities [and] can't make [him]self function to contribute to social activity." Id. He rarely leaves his house; "usually the only time [he] do[es] is if some of [his] famiy is with [him], and that's not very often." Id. Plaintiff testified that he lives with his parents because "[he] do[es]n't trust [him]self to be alone" as a result of suicidal and

homicidal thoughts he has. (R. 56). Plaintiff further testified that these pervasive thoughts affect

his ability to concentrate:

> Q    Why do you live with your mom and dad?
> A     I myself, I don't trust myself to be alone.
> Q    And why don't you trust yourself to be alone?
> A    Because I do have suicidal thoughts.
> Q    And have you ever had thoughts about killing other people?
> A    Yes, sir.
> Q    These types of thoughts that's coming from this anxiety, what - how do these
>       thoughts affect your ability to concentrate, say on a 30-minute television
>       program?
> A    I can, I can watch 30 minutes of TV and tell you nothing about it.
> Q    Why can't you tell me anything about it?
> A    I'll just, it's just like I'll watch it, but nothing sinks in.

<u>Id.</u> Plaintiff's counsel next asked him about notes that suggested he had traveled to Mississippi.

Plaintiff testified that he had "no clue" what that was about; he had a friend that lives there, but

had not talked to him in some time. (R. 56). Plaintiff testified that he had not travelled to

Mississippi:

> Q    Well, did you actually go to Mississippi?
> A    No, sir. I didn't.
> Q    Why not?
> A    I couldn't, I don't think I could handle going a distance like that and being around
>       strange people. It's -
> Q    And why can't you be around strange people?
> A    -- I just feel uncomfortable. I get all nervous and –
> Q    Well, what specifically makes you nervous about being around people?
> A    Well, for one thing where I don't have a nose I can, I'll see people, you know,
>       staring at me. I see people talking, people pointing and it just, in my head it makes
>       me feel like some kind of a monster.
> Q    From a, from a depression standpoint how does, how does feeling like a monster
>       make you feel?
> A    Just that I don't want to be seen. I just want to stay locked up in a room.
> Q    How often do you, how often do you get sad?
> A    Multiple times daily.
> Q    And how does this affect, how does being sad affect your ability to leave your
>       house?
> A    I just, I just don't want to be around anybody.

(R. 56). Later in the hearing, the ALJ further questioned Plaintiff on the subject of travel:

18

Q      All right. So Mr. Barrett . . . two different doctors reported that you told them you went to Mississippi, and that it went well. That you went to Mississippi to visit a girl. Two different doctors. Two different times. Are you telling me today you did not go to Mississippi?

A      No, ma'am. I did not go to Mississippi.

Q      Why are you telling your doctors you went to Mississippi to visit a friend?

A      I don't know, ma'am. I don't know that I told them that.

Q      Well, it would be unusual for two different doctors to make up the same story.

A      Yes, ma'am. I understand that.

Q      There's another note that you are intending to go to New York, to fly to New York here in the last couple of months. I think the note was in November that you were planning a trip. Did you go to New York?

A      No, ma'am.

Q      Said you were planning to fly by yourself. Oh. Actually no, it wasn't New York. It was Florida. Planning to fly to Florida by himself to meet a friend.

A      No, ma'am.

Q      And they thought, you thought you were ready to do that. Your medications are effectively working and you continue to feel mildly anxious when you have to go out in public. He reports he has plans on flying to Florida by himself to meet a friend. Kevin reports that he's been getting out of the house more. None of that is accurate?

A      No, ma'am. [1]

(R. 60-61).

Plaintiff testified that he was being treated for anxiety and depression by Linda McPherson at Summit Center, where he gets medication and therapy. (R. 57-58). Plaintiff testified that medication and therapy have not cured his problems. (R. 58).

Plaintiff's attorney next asked Plaintiff about the physical problems he has with regard to breathing difficulties. (R. 58). Plaintiff testified that because he does not have a nose, he has to manually clear mucus and drainage from his air passages with a suction pump so that it does not cut off his breathing. Id. Plaintiff has to use the pump "probably [] two dozen times a day . . .

---

[1] ALJ      Okay. Well, this is -- and counsel, you know what the issue here is . . . the issue is credibility.
ATTY     Absolutely, and we can try to get something to help his credibility if necessary.
ALJ      Well, I don't know that there's anything that's going to make this go away --
ATTY     Well, it wouldn't -
ALJ      -- to be quite honest.
ATTY     I could . . . get somebody who knows him to say he never did go to Mississippi. What's the date? (R. 62).

sometimes [for] 10 minutes, [but] sometimes it can be an hour." (R. 58-59). Plaintiff elaborated

on the importance of suction and his attempts to clear his airways:

> A    It get where it gets into my throat and dries out, and then it completely blocks off my throat and everything where I can't breathe.
> Q    And so this pump theoretically sucks the mucus out?
> A    Yes, sir.
> Q    Well, what happens when you don't have the pump and you need to get the mucus out?
> A    I will drink, a lot of times I'll drink a lot of water and try to get it really moist, and then I'll just try to hack it out. I end up having to make myself puke to get it out.

(R. 59). The ALJ questioned Plaintiff as to what his doctors have told him regarding his frequent

need to perform suction on his airways. (R. 62-63). Plaintiff testified that they "haven't really

said a whole lot. I think to most of them it's something new that they've never had to deal with,

and they don't really understand it." (R. 63). The ALJ noted Plaintiff's records from WVU

indicated that his doctors "were still working on trying to do a prosthesis . . . [but] the way they

were doing it was not working for you and they were looking at getting a different kind?" Id.

Plaintiff confirmed, and stated that they "haven't been able to find anybody in [] West Virginia

that will do it and my medical card won't pay for me to go out of state." Id.

Plaintiff next testified that he spends his days sitting in his bedroom. (R. 64). "[He] just

pretty much stay[s] locked up in [his] room isolated," and comes out of his room to eat meals

and use the restroom. Id.  Plaintiff testified that he cleans his own room, but does not do any

chores around the house, does not do his own laundry, does not cook, does not use a computer or

play video games, and does not read. (R. 64-65). He has a television in his room, and spends his

days watching television or sleeping. (R. 65).

**D.**    **Vocational Evidence**

Also testifying at the hearing was Larry Bell, a vocational expert ("VE").  VE Bell

characterized Plaintiff's past work as a sales person and delivery driver in home improvement as

heavy, semi-skilled work; his work in golf course maintenance as medium and semi-skilled work; his work as a derrick-hand and rig laborer as heavy, semi-skilled work, and his work as a spray painter as medium, semi-skilled work. (R. 66-67).

With regards to Plaintiff's ability to return to his prior work, VE Bell gave the following responses to the ALJ's hypothetical:

> Q      Now if we assume an individual the same age, education, and work background as the claimant who is capable of performing work at all exertional levels and has the following limitations: There should be no contact with the public. No more than occasional interaction with coworkers and supervisors. There should be no assembly line or fastpaced production requirements. No more than occasional changes in work routine or work setting. And once work is assigned it should be able to be performed primarily without working in coordination with other employees. Would such a person be able to perform any of the claimant's past work?
>
> A      Hold on just a second. The work as spray painter I believe would remain. I would eliminate the derrick worker, because that's working in coordination and tandem with other team members. And then the delivery driver would be eliminated because of the public.

(R. 67-68). Incorporating the above hypothetical, the ALJ then questioned VE Bell regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels:

> Q      Now would there be any other occupations that such an individual could perform? And could I have jobs at both the medium and light levels?
>
> A      Yes, that hypothetical individual, your honor, at the medium level I believe could function as a kitchen helper, medium, unskilled, SVP 2, 512,000 nationally, 4,200 regionally. 318.687-010. For at the light level, cleaner, light, unskilled, SVP 2, 700,000 nationally . . . and 3,500 regionally. 323.687-014.

(R. 67-68). Finally, the ALJ questioned VE Bell about Plaintiff's ability to work if he is completely credible as to the severity of his condition:

> Q      Now in the types of jobs that you've named, how much time off task is generally permissible?
>
> A      . . . Employee reaches the level of being off task of 10 percent or more at the time I think that would completely eliminate a competitive work [INAUDIBLE] at any level including the jobs that I have provided in response to your hypothetical.

Q      And does that 10 percent of off task time permit someone to leave the work
       station, for instance to go to the restroom or to go to another area of the work site?
A      It might. It will allow for an occasional additional bathroom break or something.
       You couldn't leave the, he couldn't leave the -- he couldn't leave like for an extra
       10 minutes or something like that.
Q      Okay. So you could do that up to 10 percent of the day but the duration of each is
       limited. Is that what you're saying?
A      Correct.
Q      Okay, and what is the limitation of each individual time someone would need to
       leave?
A      Well, I think that's pretty specific to the work place. I mean you couldn't take 10
       percent of the word day and say, okay I'm going to take two extra breaks that are
       five percent in breaks. But if you had a quick break a couple of times through the
       day that would be okay. The off task is like a minute here, two minutes there not
       in consecutive [INAUDIBLE].
Q      Okay. So a couple of minutes at a time.
A      Right.
Q      And how -- what is the level of absenteeism that's generally permitted?
A      Your honor, if the employee reaches the level of missing two or more days per
       month we would advise [INAUDIBLE] become involved at that point, attempting
       an intervention to correct that, and if [INAUDIBLE] it would result in
       termination.
Q      And has your testimony been consistent with the Dictionary of Occupational
       Titles?
A      I believe it is, your honor.

(R. 69-70).  Plaintiff's attorney questioned VE Bell briefly when provided the chance:

ATTY   Going to this off task time. [W]ould the task of tending to body hygiene . . . be
       classified as off task if you had to get up and leave your work station to do it?
VE     I would imagine that would be like in the restroom.
ATTY   Okay. All right. Thank you, Mr. Bell. That's all I have.

(R. 70-71).

**E.     Disability Report forms**

       On a Disability Report form dated May 21, 2013, SSA interviewer E. Murphy noted after

a face-to-face interview that Plaintiff "[h[ad no nose, just some tubes coming out of his face. Had

trouble talking. Was hard to understand at times, sister assisted." (R. 228). A subsequent

Disability Report form dated October 11, 2013 indicated additional medical visits and scar

remedification surgery, but no change to Plaintiff's conditions. (R. 255-58). A Disability Report

form dated December 2, 2013 noted that Plaintiff was taking Amitriptyline, Buspirone, and Fluoxetine for chronic mental health problems. (R. 272).

## F.     Lifestyle Evidence

On an Adult Function Report dated May 29, 2012, Plaintiff stated that his injuries and conditions affect his speech, breathing, and his ability to lift things. (R. 246). They also affect his sleep ("I have to be careful of my food tube and the tubes in my face come out"), and his ability to dress, bathe, care for his hair, and shave because he cannot get water in his face and has to cover the holes. (R. 247). Before, he was able to do all of these things normally. Id. Plaintiff reported making simple foods like sandwiches and frozen dinners once a day; he can no longer cook a lot of things he used to eat. (R. 248). He does not do chores or yard work because he cannot be around dust, dirt, or grass clippings. (R. 248-49). He reported going outside "once or twice daily," but only when his family takes him. (R. 249). Plaintiff does not go out alone or drive because he gets "nerv[ous] and sick at [his] stomach." Id. He reported that he does not go out in stores, and that someone else does his grocery shopping for him. Id.

Plaintiff stated that he used to enjoy watching television, working on trucks, and riding four wheelers, but that "the only thing I can do now is watch tv." (R. 250). Indeed, his reported daily activities consist of "sit[ting] in the house and watch[ing] tv." Id. (R. 247). He does not spend time with others, and no longer has any social activities. (R. 250-51). He does not go anywhere other than to the doctor's, and even then, he does not go alone. (R. 250). Plaintiff reported that his ability to lift, squat, bend, reach, and talk are affected:

> When lifting it strains my G tube – squatting, when I stand up I get dizzy – it puts a strain on my G tube – bending, my nasal trumpets fall out – I have no front teeth, hard to understand.

(R. 251). He reported no limitations in walking. Id. He reported that he can finish what he starts, and follows written instructions and spoken instructions okay. Id. He reported getting along with authority figures "good," and never having been fired because of problems getting along with others. (R. 252). However, he does not handle stress or changes in his routine very well any more. Id. He also reported that he gets nervous if he is alone and starts to panic. Id. As to assistive devices, Plaintiff reported that he has to use a suction machine five to six times a day. Id.

On a second adult function report dated October 28, 2013, Plaintiff reported that "I can't stand to be around people, I get to nerves [sic and I can't go out by myself." (R. 262). His daily activities were still limited to sitting in the house and watching television or sleeping. (R. 263). He reported being unable to sleep at night, adding "I might only sleep one night a week." Id. He reported that his mother had to remind him to bathe and to take his medications; he will not get his hair cut because he cannot be around people, and he cannot shave because he shakes too bad. (R. 263-64). He reported that he no longer prepared food for himself. (R. 264) ("I get to nerves [sic] it makes me sick to my stomach and I forget stuff on the stove."). He reported that he still did no chores or yardwork, noting "I feel overwhelmed." (R. 265). He does not drive. (R. 265) ("I am afraid I will get overwhelmed and maybe wreck."). His only hobby was watching television, and he does not do that very well because he cannot concentrate. (R. 266). He still only leaves the house for doctor's appointments. Id.

In a change from his prior report, Plaintiff reported that he had problems getting along with others now and been "getting mad a lot." (R. 267). He also now reported problems with memory, concentration, understanding, following instructions, and getting along with others:

> I can't remember stuff, I can't concentrate. I have a hard time understanding stuff. I have to have someone help me with instructions. I get mad easy.

Id. He reported that he can not pay attention long, no longer finishes what he starts, does not follow written instructions well and forgets spoken instructions. Id. He reported as to authority figures that he "get[s] upset and angry." (R. 268). He reported being afraid to be by himself. Id. He reported taking Buspar for anxiety. (R. 269).

On a Claimant's Medications form, Plaintiff reported taking Hydroxizine Pamoate and Sertraline for anxiety, Fenofibrate for cholesterol, Levothyroxin for his thyroid, Simvastatin for blood pressure, and Pantoprazole for acid reflux. (R. 281).

### g. Affidavit

On an affidavit dated May 28, 2015, Michael Harbert stated that he had "known and been acquainted with [Plaintiff] for several years and certainly for the past 10-15 years." (R. 283). Harbert advised that the auto cleaning and detailing business at issue in the hearing was his, and that Plaintiff had never worked there. (R. 284). "We continued to encourage him to interact with us; [] I did invite him to come up to our business . . . he was never originally at my shop to work, but [rather] to try to kill some time and to try to get back around some people." Id. Harbert stated that it soon became apparent, however, that being around the shop was not compatible with Plaintiff's condition. Id. First, as a result of his "extreme[] anxi[ety] and extreme[] sensitiv[ity] about his facial features" and appearance, Plaintiff was "not very comfortable around anybody, even [Harbert] and [his] family," despite their acceptance of him. Id. Second, as a result of his injuries, Plaintiff was "regularly [] afflicted by [] coughing spells . . . so severe that they made [Harbert] extremely uncomfortable and worried that he may have some kind of life-threatening event." Id. Harbert elaborated that:

> I am also aware that there was more damage than just cosmetic loss of his nose because when I was around him after the event, he was frequently troubled by rather violent coughing fits from some type of drainage or something and he would often times be

> noticeably severely choking and coughing; that Kevin's coughing fits were the most troubling when he was around any people (public place or strangers), at which time the coughing fits would seem to come on every 10 minutes or so; that when he started these severe coughing fits, Kevin would go to the restroom to try to get calmed down; that my wife and I have both, on occasion, followed him into the restroom because we were afraid that he would pass out or have some other severe medical emergency due to the severity of the coughing fit.

(R. 283). Ultimately, given these issues, Harbert "felt it was not good for me or him for him to be around our shop." Id.  Harbert stated that he "continue[d] to encourage [Plaintiff] to come to the house or to come over if we went camping, but he generally would/did not come." Id.

Lastly, Harbert stated that he does not believe that Plaintiff went on any trips, as he knows Plaintiff's situation and it would not have permitted him to have taken such a trip. (R. 284) ("he has no money and his family does not particularly have money for such trips . . . I am fairly certain that [he had no one] to go to Florida or Mississippi to visit, and I do not believe he could have tolerated going on [a trip of that nature]."). Harbert elaborated that:

> after his injury, I did notice that Kevin would mistakenly or otherwise, somehow, recall events of our prior relationship which did not occur; that it was like he was making things up or was being confused; that when he would ask me or tell me about events, I would just have to tell him that these things did not occur; that I also noticed that he got confused as to my relationship with my children; that the children is technically a stepdaughter; that after the event, he insisted that my stepdaughter was my daughter, when before the injury he knew very well that she was only [m]y stepdaughter; that I am not sure but it certainly appears his thought processes have changed significantly since the suicide event . . .

(R. 284).

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.     ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since January 9, 2013, the alleged onset date (20 CFR 404.1571, *et seq.* and 416.971, *et seq*).

3.      The claimant has the following severe impairments: status post gunshot wound to the face with multiple fractures, amputation of the nose, and palate destruction; major depressive disorder/adjustment disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no contact with the public; no more than occasional interaction with co-workers and supervisors; no assembly line, no fast paced production requirements, no more than occasional changes in work routine or work setting; and once work is assigned, work should be able to be performed primarily without working in coordination with other employees.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 28, 1974 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 9, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 20-31).

## VI.     <u>DISCUSSION</u>

### A.     Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B.     Contention of the Parties

Plaintiff, in his Motion for Summary Judgment, asserts that the Commissioner's decision "is not supported by substantial evidence." (Pl.'s Mot. at 1).  Specifically, Plaintiff alleges that

1.    The opinion of treating psychiatrist Dr. Aromin has not been reconciled, constituting a failure of the Commissioner to fulfil her "quintessential duty to assess the probative value of competing evidence." (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 5, ECF No. 10) (citing <u>Meyer v. Astrue,</u> 662 F.3d 700 (4th Cir. 2011).

2.    The ALJ's evaluation of the medical opinions does not adhere to the requirements of 20 C.F.R. § 404.1527 and is not supported by substantial evidence. <u>Id.</u> at 7.

Plaintiff asks the Court to "remand his claim for the calculation of benefits, [or i]n the alternative . . . for further proceedings." <u>Id.</u> at 15.

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 11). Specifically, Defendant alleges that:

1.    The Appeals Council reasonably decided Dr. Aromin's opinion did not require remand to the ALJ for consideration. (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 8, ECF No. 12) (citing <u>Edgell v. Comm'r,</u> Civ. Act. No. 14-82, 2015 WL 3868478 (N.D.W.Va. Jun. 23, 2015).

2.    The ALJ's assignment of weight to Dr. Goudy's opinion and Plaintiff's GAF scores is supported by substantial evidence. <u>Id.</u> at 11.

Defendant asks the Court to affirm the ALJ's determination. (ECF No. 12 at 13).

In his response brief, Plaintiff first argues that Defendant's reliance on <u>Edgell</u> is misplaced because the facts and analysis are distinct from Plaintiff's case here, and that <u>Meyer</u> should control. (ECF No. 13 at 1-4). Second, Plaintiff reiterates that the ALJ's decision was not supported by substantial evidence on various grounds. <u>Id.</u> at 4-8).

## C.  Analysis of the Commissioner's Decision

When requesting review by the Appeals Council, 20 C.F.R. § 404.968 permits a claimant to submit additional evidence that was not before the ALJ. 20 C.F.R. § 404.970(5) provides that the Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."

Primarily at issue is the Appeals Council's treatment of psychological evidence – namely, the opinion of treating specialist Dr. Jourdan Aromin. After the ALJ's decision was issued, Dr. Aromin's opinion was submitted to the Appeals Council with a request for review. (R. 13). The Appeals Council considered the evidence and made it part of the record, but declined to review the case, finding that "the additional evidence does not provide a basis for changing the Administrative Law Judge's decision." (R. 2), 20 C.F.R. § 404.970(5).

When the Appeals Council declines to disturb an ALJ's decision on the basis of new evidence submitted after the decision was rendered, the resulting final decision of the Commissioner is reviewed under sentence four of 42 U.S.C § 405(g). <u>Wilkins v. Sec'y,</u> 953 F.2d 93 (4th Cir. 1991). A court may review the final decision for substantial evidentiary support when the evidence is sufficient to permit a reviewing court to make a determination as to whether the final decision is supported by substantial evidence. <u>Meyer,</u> 662 F.3d at *707, <u>citing</u> <u>DeLoatche v. Heckler,</u> 715 F.2d 148 (4th Cir. 1983). In this circumstance, a reviewing court considers the

entire record, including the new evidence. <u>Wilkins,</u> 953 F.2d at *96. When the new evidence contains information responsive to an evidentiary gap identified by the ALJ as a reason supporting denial, however, and there is conflicting evidence in the record, the reviewing court may not "assess the probative value of competing evidence" in the first instance. <u>Meyer</u> at *707.

### 1. Dr. Aromin's opinion presented new evidence responsive to an evidentiary gap that played a role in the ALJ's decision to deny benefits.

Plaintiff argues that the Appeals Council's treatment of the new evidence was erroneous under <u>Meyer</u> because the opinion from Plaintiff's treating source, Dr. Jourdan Aromin, addresses evidentiary gaps that contributed to the ALJ's decision to deny benefits. (ECF No. 10 at 5-7). The undersigned is compelled to agree.

In <u>Meyer,</u> the ALJ stated that the decision was influenced by the lack of any restrictions placed on the Plaintiff by a treating physician. 662 F.3d 700 (4th Cir. 2011). Meyer subsequently obtained and submitted a letter from his treating physician in which he opined 1) a list of long-term restrictions, and 2) an agreement with the findings of another doctor whose opinion the ALJ had rejected:

> After issuance of the ALJ decision on June 5, 2008, Meyer timely sought review by the Appeals Council. With his request for review, Meyer submitted new evidence not before the ALJ, including an opinion letter from his treating physician, Dr. Bailey, dated August 18, 2008. In the letter, Dr. Bailey described Meyer's back injury and surgery and explained that Meyer's "post operative course has been complicated by chronic, debilitating back pain which was anticipated due to the magnitude of his injury." Dr. Bailey opined that Meyer's "long term restrictions include no lifting greater than 10 pounds, avoid bending, stooping, squatting, and no sitting, standing or walking for more than 30 minutes without rest periods." He explained that Meyer "will continue to require frequent follow-up and medical management" and *704 "will [likely] require further surgical intervention in the future." At the close of his letter, Dr. Bailey noted his "agreement with the majority of [Dr. Weissglass's] findings."

<u>Id.</u> at *703-04. The <u>Meyer</u> court observed that this may not have been determinative, had there been sufficient evidence in the case to determine that the Commissioner's decision was

nonetheless supported by substantial evidence. Id. at *707. However, because the evidence was conflicting and not "one-sided," remand was necessary. Id.

Defendant argues that this case is more akin to Edgell because the ALJ's decision here was not based on a lack of evidence, but rather based on specific medical evidence. (ECF No. 12 at 10). In Edgell, the district court declined to remand under Meyer because it found that the ALJ's decision did not depend on the absence of evidence contained in the treating physician's opinion, and it could determine that there was substantial evidence to support the ALJ's opinion:

> [T]he Court can determine whether substantial evidence supports the ALJ's decision because, unlike Meyer, [the treating physician's] statement did not fill an "evidentiary gap" that played a role in the ALJ's decision, [which] did not mention that the record lacked such evidence . . . [moreover], the Appeals Council did not err in denying Edgell's request for review because substantial evidence supports the ALJ's decision.

Civil Action No. 3:14-CV-82, 2015 WL 3868478, *6 (N.D.W.Va. Jun. 23 2015). The issue is whether Aromin's opinion supplies evidence that the record lacked, the absence of which influenced the ALJ's decision. The undersigned finds that it does.

In his response, Plaintiff argues that Dr. Aromin's opinion addressed the gap in credibility identified by the ALJ. (ECF No. 10 at 7). While that may technically be true, a review of the ALJ's opinion evidences that the ALJ had already addressed the evidence that Aromin provided with regard to credibility, as the ALJ considered statements from other sources on that issue.

In fact, as to Plaintiff's statements about working, the ALJ concluded after considering the affidavit of Michael Harbert that Plaintiff did *not* work at his shop as the statements made to his providers indicated. (R. 22). However, the ALJ noted that resolving that question of fact did not aid Plaintiff's credibility, because while it tended to prove Plaintiff had not worked, it also tended to prove that Claimant's statements were unreliable. Id. ("However, the fact that the

claimant told the consultative examiner that he was working does tend to detract from the claimant's credibility."). The ALJ explained that:

> The record reflects various references to the claimant working at an auto detailing shop. At the hearing, the claimant denied working, despite the many references in the treatment records. Michael Harbert, the claimant's friend and owner of the body shop, prepared an affidavit, and he denied that the claimant worked in the auto detailing shop, and, rather, the claimant was there to kill time:
>
>> that when Kevin was at my shop, he really was unable to meet the public and really was unable to perform any tasks because of his frequent coughing; that he was never originally at my shop to work, but was there to try to kill some time and to try to get back around some people ...
>
> Exhibit 13E/2. Mr. Harbert noticed a tendency for the claimant "mak[e] things up" (Exhibit 13E/2). While this could explain some of the claimant's statements to treating providers, the tendency to make things up is not something that would enhance the credibility of the claimant's allegations concerning the severity of his symptoms. Despite the fact that there may be not malicious intent. these types of inconsistencies make it difficult to ascertain the true severity of the claimant's mental complaints and physical complaints.

(R. 20-21).

As to Plaintiff's statements about travel, the ALJ considered the statements of Plaintiff's treating physician Dr. Snuffer that although Plaintiff told him he had traveled, he doubted that was true. The ALJ concluded that those statements too could not be accepted as true, but that like Plaintiff's statements about work, the fact that they were made likewise supported the conclusion that Plaintiff's statements generally could not be considered reliable:

> The undersigned accepts the statements from this treating source as evidence that the claimant may well not have traveled to Mississippi or other locales outside of West Virginia. However, the fact remains that Dr. Snuffer confirmed that the claimant did in fact tell him he was going to Mississippi, which directly contracts the statements made by the claimant at the hearing. While there is no evidence that this was an intentional attempt to mislead the undersigned, this does raise some questions about the credibility of the remainder of the claimant's allegations concerning the severity of his symptoms.

(R. 28). As a result, the undersigned cannot say that the opinion of Dr. Aromin addresses a credibility gap that played a role in the ALJ's denial. Although Dr. Aromin does provide a psychological explanation for Plaintiff's tendency to make such statements, the ALJ fairly

concluded that even if for innocent reasons, Plaintiff still undeniably had made conflicting statements that call his statements generally into question. For that, the undersigned cannot fault the ALJ.

However, Defendant's argument that <u>Edgell</u> controls because there is no evidentiary gap is also unavailing, because Plaintiff's credibility is not the only evidentiary gap mentioned by the ALJ that Dr. Aromin addressed. Although the parties focus heavily on the limitations endorsed by various sources as to the paragraph B criteria of listings 12.04 and 12.06, as well as the credibility of Plaintiff's statements relevant to same, the paragraph B criteria are not the only means by which Plaintiff can satisfy the listing criteria.

Listing 12.00 (Mental Disorders – Adult) explains, in relevant part, that Listing 12.04 "ha[s] three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, **or the requirements of both paragraphs A and C.**" 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00(A)(2).[2] The ALJ stated, in relevant part as to the paragraph C criteria of Listing 12.04, that:

> The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the paragraph C criteria. **In terms of 12.04, there is no evidence of** repeated episodes of decompensation, each of extended duration; **a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate**; or a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

(R. 23) (emphasis added).

---

[2] There is no dispute as to the Paragraph A criteria of 12.04. Indeed, agency reviewers at the initial and reconsideration level both determined that the paragraph A criteria of listing 12.04 were satisfied. (R. 107, 121).

Dr. Aromin explicitly opined, in addition to Plaintiff meeting the Paragraph A and B criteria, that Plaintiff expressly satisfied the criteria in Listing 12.04, paragraph C.[3] (R. 802) (opining that Plaintiff's chronic mental conditions were accompanied by such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate). He explained in his narrative that:

> I would add that I additionally describe Kevin's situation as quite fragile, or perhaps brittle, in the sense that he also demonstrates . . . that even minimal increases in mental demands or other changes would likely cause him to further withdraw and decompensate.

(R. 804). Dr. Aromin also referenced Plaintiff's "minimal, immature coping capacity" and "primitive coping defense" in observing Plaintiff's very limited capacity to deal with his circumstances. (R. 803). As such, it appears to the undersigned that Aromin's opinion clearly addressed evidence the ALJ found the record to be lacking, and that the other opinions the ALJ considered – those of Dr. Snuffer and Dr. Goudy – did not address. The situation contemplated here is practically identical to that in <u>Meyer</u>; <u>Edgell</u> is not on point. For these reasons, like in <u>Meyer,</u> assessing the probative value of Aromin's opinion is a role the undersigned cannot undertake in the first instance:

> The evidence in this case, however, is not as one-sided as that in *Smith* or *Wilkins.* On consideration of the record as a whole, we simply cannot determine whether substantial evidence supports the ALJ's denial of benefits here. The ALJ emphasized that the record before it lacked "restrictions placed on the claimant by a treating physician," suggesting that this evidentiary gap played a role in its decision. Meyer subsequently obtained this missing evidence from his treating physician. That evidence corroborates the opinion of Dr. Weissglass, which the ALJ had rejected. But other record evidence credited by the ALJ conflicts with the new evidence. The Appeals Council made the new evidence part of the record but summarily denied review of the ALJ decision.
> Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding.

---

[3] This is the language of 12.04(C)(2); as to 12.04(C)(1), no party has disputed that there is evidence of "medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing."

662 F.3d at *707. This is precisely the situation before the court now. The ALJ specified that "In terms of 12.04, there is no evidence of . . . a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate." (R. 23). Such evidence was subsequently obtained from Dr. Aromin, his treating psychologist. The Appeals Council made the new evidence part of the record but denied review. Thus, as in <u>Meyer,</u> "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." <u>Id.</u> at 707. Accordingly, remand is required for consideration of Dr. Aromin's opinion and reconciliation with the record, and it is inappropriate for the court to review whether the ALJ's opinion had support from substantial evidence.

### 3.  <u>RECOMMENDATION</u>

For the reasons herein stated, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **GRANTED** as to his first argument (I), with (II) precluded from consideration under <u>Meyer</u>; that Defendant's Motion for Summary Judgment (ECF No. 11) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for consideration and reconciliation of Dr. Aromin's opinion with the record and further proceedings consistent with this report and recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M.

Keeley, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this January 22, 2018.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE